UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE

UNITED STATES OF AMERICA                                                PLAINTIFF

v.                                           CRIMINAL ACTION NO. 3:15-CR-00116-CRS

CORNELIUS EUGENE PENDELTON                             DEFENDANT

**<u>MEMORANDUM OPINION</u>**

I. <u>Introduction</u>

A federal grand jury indicted Defendant Cornelius Eugene Pendelton and his co-defendants for conspiring "to possess with the intent to distribute five kilograms or more" of cocaine. Indictment 1, ECF No. 1. Pendelton moved to suppress any evidence obtained as a result of a traffic stop on May 14, 2015, ECF No. 100. The United States responded, ECF No. 108. This Court referred the motion to the magistrate judge "for a hearing, if necessary, and for findings of fact, conclusions of law, and recommendation" under 28 U.S.C. § 636(b)(1)(A). June 6, 2016 Order, ECF No. 113. On October 17, 2016, the magistrate judge held an evidentiary hearing on the motion to suppress. Evid. Hr'g Tr., ECF No. 141. Both the United States and Pendelton filed post-hearing briefs. U.S. Brief, ECF No. 148; Pendelton Brief, ECF No. 153; U.S. Reply, ECF No. 163. The magistrate judge recommended that this Court grant in part and deny in part Pendelton's motion to suppress. R. & R. 1, ECF No. 165. Pendelton objects to the magistrate judge's findings of fact, conclusions of law, and recommendation ("report and recommendation"). Obj. R. & R., ECF No. 168.

1

For the reasons set forth below, the Court will adopt the report and recommendation in full. The Court will overrule Pendelton's objections to the magistrate judge's report and recommendation. The Court will grant in part and deny in part Pendelton's motion to suppress.

II. Legal Standard

The Court shall make a de novo determination of the proposed findings or recommendations to which Pendelton objects. *See* 28 U.S.C. § 636(b)(1)(B); Fed R. Crim. P. 59(b)(3). The Court shall accept those findings and conclusions to which neither party objects. *See* Fed. R. Crim. P. 59(b)(3).

III. Background

The magistrate judge accepted the following facts based upon the testimony of Officers Gregory Odle and Josh Thompson that was presented at the evidentiary hearing. *See* Evid. Hr'g Tr. 97, ECF No. 141. This Court will repeat those facts necessary to provide context for review of Pendelton's objections.

From late 2014 to the middle of 2015, the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF") conducted an ongoing investigation of narcotics trafficking in the Park Hill Housing Authority ("Park Hill") in West Louisville. R. & R. 1, ECF No. 165. Park Hill is a "very active" area for crime, including for narcotics trafficking. *Id.* The ATF sought assistance in the Park Hill investigation from the Louisville Metro Police Department's Housing Authority Liaison Officers ("the HALO officers"). *Id.* at 2.

Two of these HALO officers were Officers Odle and Thompson, both of whom are experienced officers that have worked for the Louisville Metro Police Department since 2011 and 2010, respectively. *Id.* Officers Odle and Thompson were briefed on the specifics of the Park Hill investigation and given access to pole cam footage within Park Hill, which they could access

in real time via computers in their vehicles. *Id.* Officers Odle and Thompson were informed that Roscoe Clark's unit in Building 5, Apartment D and Building 2, Apartments B and C were target locations of the investigation. *Id.* Officers Odle and Thompson were also aware that Pendelton was suspected of regularly moving drugs from one location to another. *Id.*

On May 14, 2015, HALO officers received an independent tip from a concerned citizen of a narcotics complaint on Building 2, Apartments B and C. *Id.* Based on this tip, Officers Odle and Thompson recovered narcotics after stopping two or three vehicles leaving Building 2, Apartments B or C early that day. *Id.* Later that afternoon, Officer Odle was parked on 11th Street. *Id.* He could not directly view Building 5 but was watching pole cam footage of the outside of Clark's unit in Building 5, Apartment D on his computer. *Id.* In a nearby alley, Officer Thompson and a probationary officer were also watching pole cam footage of the target apartments. *Id.* Officers Odle and Thompson were communicating with one another through a closed police radio channel and discussing their observations. *Id.*

Officer Odle observed pole cam footage of an individual on a bicycle leaving Clark's unit at Building 5, Apartment D and traveling to Building 2, Apartment B. *Id.* The individual was wearing orange. *Id.* at 3. From his parked view on 11th Street, Officer Odle observed the individual enter Building 2, Apartment B, stay inside for a few minutes, exit the apartment, and ride his bicycle back toward Building 5. *Id.* Again utilizing pole cam footage, Officer Odle observed the individual enter Building 5, Apartment D and remain inside for a few minutes. *Id.* Based on his previous experience, Officer Odle recognized the individual's actions of traveling by bicycle and remaining in the target locations for only a few minutes as consistent with narcotics trafficking. *Id.*

Officer Odle observed the individual exit Building 5, Apartment D on foot and walk toward 12th Street out of view of his pole cam footage. *Id.* From his vehicle, however, Officer Odle was able to then see the individual enter the passenger side of a Ford F-150 pickup truck. *Id.* Officer Odle recognized the truck from previous traffic stops in the Park Hill investigation. *Id.* While previous stops of the F-150 had not turned up narcotics, the most recent time that officers had attempted to stop the F-150, the vehicle had fled. *Id.*

Officer Odle observed the F-150 disregard a stop sign while making a right-hand turn before losing sight of the truck. *Id.* He radioed Officer Thompson to alert him of the stop-sign violation and remained parked on 11th Street to continue his surveillance of Park Hill. *Id.* Officer Thompson began following the F-150 down 11th Street. *Id.* He continued to follow the F-150 for five or six blocks to avoid making the traffic stop within Park Hill. *Id.* Officer Thompson then initiated his emergency equipment, and the F-150 immediately pulled over. *Id.*

Officer Thompson approached the F-150 on the passenger side, while the probationary officer approached the driver's side. *Id.* at 4. Officer Thompson immediately recognized the front seat passenger as Clark and knew that Clark had two bench warrants for his arrest. *Id.* Officer Thompson asked Clark to exit the F-150, placed him in handcuffs, performed a search incident to arrest, and found a small baggie of pills in his pocket. *Id.* Officer Thompson also recognized the F-150's driver as Keith Irvin and the back seat passenger as Pendelton. *Id.*

After securing Clark in handcuffs at the rear of the vehicle, Officer Thompson opened the back passenger door where Pendelton was seated and asked him to step out of the vehicle. *Id.* Officer Thompson noticed that Pendelton had an orange pullover on the seat beside him. *Id.* At that point, Officer Thompson concluded that Pendelton was the individual that Officer Odle had observed walking and biking between the two target locations. *Id.* Officer Thompson noticed that

Pendelton was acting very nervous—sweating and breathing heavily—which was inconsistent with Officer Thompson's prior interactions with Pendelton, when Pendelton had been "cool, calm, and collected" and "very respectful to police officers." *Id.* Based on these observations, Officer Thompson was "100 percent sure there was something on [Pendelton's] person narcotics wise." *Id.*

Officer Thompson did a quick pat down of Pendelton, checking for weapons because he knew that narcotics traffickers are frequently armed. *Id.* During this pat down, Officer Thompson felt what he immediately recognized as narcotics in both Pendelton's right and left pockets. *Id.* He recovered hydrocodone pills from Pendelton's right pocket and a baggie of marijuana from his left pocket. *Id.* Pendelton continued acting nervously during the pat down and stated multiple times that he believed he was going to jail. *Id.* at 4–5. Officer Thompson tried to "play it off," telling Pendelton that he was "not looking to take nobody to jail here today." *Id.* at 5. After uncovering the pills and marijuana, Officer Thompson discontinued his pat down for weapons and initiated a more thorough search of Pendelton's person. *Id.* Officer Thompson then found a baggie of cocaine wrapped in a twenty-dollar bill in Pendelton's small coin pocket on his right side. *Id.* Officer Thompson subsequently put Pendelton in handcuffs and placed him in custody at the back of the vehicle. *Id.*

After receiving Irvin's consent to search the F-150, Officer Thompson recovered a large baggie of suspected crack cocaine from under Pendelton's seat. *Id.* Upon questioning, Pendelton admitted that the crack cocaine under the rear passenger seat was his. *Id.* At no point during Officer Thompson's interaction with Pendelton did he give Pendelton *Miranda* warnings. *Id.*

Officer Thompson gave Irvin a verbal warning for disregarding the stop sign. *Id.* He wrote Pendelton a citation for possessing narcotics, trafficking in narcotics, and possession of

marijuana. *Id.* Officer Thompson did not arrest any of the individuals in the F-150. *Id.* at 6. Nearly five months later, a federal grand jury in the Western District of Kentucky indicted Pendelton and his co-defendants. *Id.* The Court will adopt the magistrate judge's factual findings in full.

IV. Analysis

Pendelton moves to suppress all evidence obtained as a result of this traffic stop. Mot. Suppress 1, ECF No. 100. Pendelton made four arguments in his motion: (1) the officers' stop of the F-150 was illegal; (2) the length and scope of the detention exceeded that allowed for a traffic stop; (3) Officer Thompson did not have probable cause to search Pendelton's person; and (4) Officer Thompson did not have probable cause to search the F-150. *Id.* at 1–2. Pendelton's post-hearing brief also asserts that his statements to Officer Thompson should be suppressed because he was not given his *Miranda* rights. Pendelton Post-Hr'g Brief 1, ECF No. 153.

The magistrate judge concluded that (1) the officers' stop of the F-150 was legal because Officer Odle observed the F-150 disregard a stop sign and because the officers had reasonable suspicion of criminal activity, R. & R. 6–11, ECF No. 165; (2) the length and scope of the detention did not exceed that allowed for a traffic stop, *id.* at 11–13, 23, 26; (3) Officer Thompson had reasonable suspicion to perform a pat down of Pendelton and his search of Pendelton was proper because it fell under the "search incident to arrest" exception to the warrant requirement, *id.* at 14–23; (4) the search of the F-150 was proper because Irvin gave his consent to search it and based on the "automobile exception" to the warrant requirement, *id.* at 23–26; and (5) Pendelton's statements to Officer Thompson should be suppressed for lack of *Miranda* warnings, *id.* at 26–27.

Pendelton asserts these objections: (1) the traffic stop cannot be justified by Officer Odle's observation of the F-150 disregarding a stop sign, Obj. R. & R. 1–3; (2) the traffic stop cannot be justified by reasonable suspicion of criminal activity, *id.* at 3–5; and (3) Officer Thompson did not have reasonable suspicion to justify Pendelton's pat down, *id.* at 5–6. The Court will address Pendelton's objections to the magistrate judge's report and recommendation in turn.

        A.  <u>Legality of the Traffic Stop Based on Observation of Traffic Violation</u>

Pendelton objects to the magistrate judge's conclusion of law that the traffic stop was legal because Officer Odle observed the F-150 disregard a stop sign. *Id.* at 2. He asserts that because Officer Thompson was not the officer to observe the traffic violation, the traffic stop was illegal. *Id.*

"A police officer legally may stop a car when he has probable cause to believe that a civil traffic violation has occurred." *United States v. Blair*, 524 F.3d 740, 748 (6th Cir. 2008) (citing *United States v. Sanford*, 476 F.3d 391, 394 (6th Cir. 2007)). Probable cause is satisfied "where 'the facts and circumstances within [the officers'] knowledge and of which they had reasonably trustworthy information [are] sufficient in themselves to warrant a man of reasonable caution in the belief that' an offense has been or is being committed.'" *United States v. Davis*, 430 F.3d 345, 352 (6th Cir. 2005) (citing *Brinegar v. United States*, 338 U.S. 160, 175–76 (1949)). The "collective knowledge" or "fellow officer" rule allows an officer to "conduct a stop based on information obtained by fellow officers." *United States v. Lyons*, 687 F.3d 754, 765–66 (6th Cir. 2012) (citations omitted). There are three inquiries when applying the collective knowledge doctrine: "(1) the officer taking the action must act in objective reliance on the information received; (2) the officer providing the information must have facts supporting the level of

7

suspicion required; and (3) the stop must be no more intrusive than would have been permissible for the officer requesting it." *Id.* at 767 (citing *United States v. Williams*, 627 F.3d 247, 252–53 (7th Cir. 2010)).

On de novo review, the Court finds that all three requirements are met in this case. Officer Odle observed the F-150 disregard a stop sign while making a right-hand turn before losing sight of the truck. R. & R. 3, ECF No. 165. Thus, Officer Odle had facts supporting the level of suspicion required because he saw the F-150 commit a civil traffic violation. Officer Odle then radioed Officer Thompson to alert him of the stop-sign violation and remained parked on 11th Street to continue his surveillance of Park Hill. *Id.* After following the F-150 briefly to ensure that he was no longer in Park Hill, Officer Thompson initiated his emergency equipment, and the F-150 immediately pulled over. *Id.* Thus, Officer Thompson acted in objective reliance on the information he received from Officer Odle. Finally, it was no more intrusive for Officer Thompson to stop the F-150 than it would have been for Officer Odle to stop the vehicle because both officers were investigating narcotics trafficking in Park Hill.

Pendelton maintains that the language in Kentucky Revised Statutes § 431.015 and the holding in *Cowan v. Commonwealth*, 215 S.W.2d 989 (Ky. 1948) dictate that Officer Thompson must have personally observed the traffic violation in order to legally stop the F-150. Obj. R. & R. 2, ECF No. 168. Kentucky statute allows an officer to "issue a citation . . . for a violation committed in his or her presence." Ky. Rev. Stat. Ann. § 431.015(2). In *Cowan*, the state appellate court held that the defendant's arrest was not authorized because the officer had no warrant, no reasonable ground for believing a felony had been committed, and no offense had been committed *in his presence*. 215 S.W.2d at 991. But the Sixth Circuit has specifically addressed the interaction between the Fourth Amendment and this Kentucky statute in *Pyles v.*

8

*Raisor*. 60 F.3d 1211, 1215 (6th Cir. 1995). The *Pyles* court held that, regardless of the statute's "presence" requirement, an arresting officer can make a warrantless arrest if he has probable cause to believe that there was a violation of law. *Id.* Given that holding, Officer Thompson legally stopped the F-150 when he had probable cause to believe that Officer Odle witnessed the F-150 disregard a stop sign.

Pendelton attempts to distinguish *Pyles* from this case by pointing out that *Pyles* concerns 42 U.S.C. § 1983, making it a civil matter. Obj. R. & R. 2–3, ECF No. 168. But it does not matter that *Pyles* is a § 1983 case. § 1983 is merely a vehicle for asserting constitutional rights in civil cases. The plaintiff in *Pyles* was asserting her Fourth Amendment rights, just as Pendelton is doing in this case. Accordingly, *Pyles* is controlling here and Pendelton's objection to the magistrate judge's conclusion that the traffic stop was legal because Officer Odle observed the F-150 disregard a stop sign will be overruled.

### B. Legality of the Traffic Stop Based on Reasonable Suspicion of Criminal Activity

Pendelton objects to the magistrate judge's conclusion that the officers' stop of the F-150 was legal because the officers had reasonable suspicion of criminal activity. *Id.* at 5. He asserts that because the independent tip from a concerned citizen was anonymous, it needed to be corroborated by the police. *Id.* at 4. He further asserts that there was insufficient evidence to corroborate the anonymous tip. *Id.*

The magistrate judge found that the traffic stop was alternatively justified under *Terry v. Ohio*, 392 U.S. 1 (1968). R. & R. 11, ECF No. 165. "Under *Terry*, police may stop a vehicle based on reasonable suspicion of an ongoing crime." *Blair*, 524 F.3d at 750 (citing *Sanford*, 476 F.3d at 394). The stop must be supported by "specific and articulable facts that would 'warrant a man of reasonable caution in the belief that the action taken was appropriate.'" *Id.* (citing *Terry*,

9

392 U.S. at 21–22). In determining the validity, the Court must consider the totality of the circumstances. *Id.*

Pendelton takes issue with the sufficiency of evidence to corroborate the anonymous tip. Obj. R. & R. 4, ECF No. 168. Where a tip comes from an anonymous informant and no information exists as to the informant's reliability, law enforcement must corroborate the tip to establish reasonable suspicion. *United States v. Brooks*, 594 F.3d 488, 493 (6th Cir. 2010) (citing *United States v. Frazier*, 423 F.3d 526, 532 (6th Cir. 2005)). Here, the magistrate judge determined that, combined, the officers' knowledge of the ATF investigation, the accurate anonymous tip, the officers' observance of Pendelton's conduct in Park Hill, and Pendelton entering Irvin's known vehicle gave rise to a reasonable suspicion of an ongoing crime. R. & R. 11, ECF No. 165.

On de novo review, the Court finds that there was sufficient corroborating evidence here. Officers Odle and Thompson were aware that the ATF was investigating Park Hill for narcotics trafficking. R. & R. 1–2, ECF No. 165. The officers were aware that Building 5, Apartment D and Building 2, Apartments B and C were target locations of the investigation. *Id.* at 2. Additionally, Officers Odle and Thompson observed an individual on a bicycle coming and going from these target locations. *Id.* The individual would enter a target location and stay inside for only a few minutes before riding his bicycle to another target location. *Id.* at 3. Based on his previous experience, Officer Odle recognized the individual's actions of traveling by bicycle and remaining in the target locations for only a few minutes as consistent with narcotics trafficking. *Id.* Officer Odle then observed the individual enter the passenger side of the F-150. *Id.* While previous stops of the F-150 had not turned up narcotics, the most recent time that officers had attempted to stop the F-150, the vehicle had fled. *Id.*

Moreover, while the tip was indeed anonymous, it had turned out to be accurate earlier that day. Based on the anonymous tip, Officers Odle and Thompson had recovered narcotics after stopping two or three vehicles leaving Building 2, Apartments B or C earlier that day. *Id.* Given the totality of the circumstances, the Court finds that there was sufficient corroborating evidence to give rise to a reasonable suspicion of an ongoing crime. Accordingly, Pendelton's objection to the magistrate judge's conclusion that the officers' stop of the F-150 was legal because the officers had reasonable suspicion of criminal activity will be overruled.

### C. Pat Down of Pendelton

Pendelton objects to the magistrate judge's conclusion that Officer Thompson's pat down of Pendelton was valid. Obj. R. & R. 5–6, ECF No. 168. "When an officer makes a *Terry* stop, he may also perform a precautionary search—known as a 'frisk' or 'pat down'—whenever he has a 'reasonable suspicion' that the person searched may be armed and dangerous." *United States v. Pacheco*, 841 F.3d 384, 390 (6th Cir. 2016) (citing *Knowles v. Iowa*, 525 U.S. 113, 118 (1998)). "Reasonable suspicion is based on the totality of the circumstances . . . and it exists if a reasonably prudent [person] in the circumstances would be warranted in the belief that his . . . safety or that of others was in danger." *United States v. Noble*, 762 F.3d 509, 521–22 (6th Cir. 2014) (citing *Terry*, 392 U.S. at 27) (internal quotation marks omitted). For this fact-specific analysis, the Supreme Court has suggested that "two decisions when viewed together may usefully add to the body of law on the subject." *United States v. Arvizu*, 534 U.S. 266, 275 (2002) (citing *Ornelas v. United States*, 517 U.S. 690, 697–98 (1996)) (internal quotation marks omitted).

The magistrate judge took the Supreme Court's advice and compared the facts of *Pacheco* and *Noble* to the facts in this case. R. & R. 14–19, ECF No. 165. The magistrate judge

11

concluded that, based on an analysis of the facts of those cases, Officer Thompson had reasonable suspicion to justify his pat down of Pendelton. *Id.* at 17. Pendelton specifically objects to the outcome of that comparison. Obj. R. & R. 6, ECF No. 168. He argues that this case is more like *Noble*, in which the Court found that there was no reasonable suspicion, than it is like *Pacheco*, in which the Court found that there was reasonable suspicion.[1] *Id.*

1. *United States v. Noble*

In *Noble*, officers received a tip that individuals were transporting methamphetamine from Louisville, Kentucky to eastern Kentucky. 762 F.3d at 514. The informant initially advised the officers to look for a white Jeep Cherokee, but later advised that they should also look for a dark-colored Chevy Tahoe. *Id.* The officers located a dark-colored Chevy Tahoe and, after observing a traffic violation, stopped the vehicle. *Id.* at 514–15. One officer asked the defendant, Noble, to exit the vehicle. *Id.* at 516. The officer then conducted a pat down on Noble. *Id.* The government gave the following three reasons to justify the officer's pat down of Noble: (1) Noble's nervousness, (2) Noble's presence in a car suspected of involvement in drug trafficking, and (3) the officer's knowledge, from training and experience, that individuals involved in drug trafficking are generally armed. *Id.* at 522.

The Sixth Circuit in *Noble* held that, while the situation "pose[d] a close question," these three factors did not "add up to reasonable suspicion." *Id.* First, the court noted that generally, "nervousness—even extreme nervousness—'is an unreliable indicator' of someone's dangerousness, 'especially in the context of a traffic stop.'" *Id.* (citing *United States v. Richardson*, 385 F.3d 625, 630 (6th Cir. 2004)). The court then afforded very little weight to Noble's nervousness because the officer did not immediately pat down Noble upon noticing the

---

[1] Although Pendelton uses the term "probable cause" in his objection, the correct standard when judging the validity of a pat down is "reasonable suspicion." *See, e.g.*, *Pacheco*, 841 F.3d at 390.

nervousness, Noble did not become increasingly nervous, and Noble complied with all of the officer's commands. *Id.* at 523.

Second, the court noted that "a person's mere presence in a car, which the police believe is connected to drug trafficking, is not an automatic green light for frisking that person." *Id.* (citing *United States v. Bell*, 762 F.2d 495, 499 (6th Cir. 1985)). Rather, "an officer must have specific, articulable reasons to believe that a particular person is armed and dangerous before the officer may frisk a suspect." *Id.* (citing *United States v. Cortez*, 449 U.S. 411, 417 (1981)). In *Noble*, the officer did not recognize Noble as a person with a criminal history, and Noble was not behaving in a threatening manner. *Id.* at 523–24.

Third, the court agreed that an officer "can 'rely on his [or her] training and experience that drug dealers frequently carry weapons,'" but emphasized that the court has "always required some corroboration that particular individuals are involved in dealing drugs before allowing a frisk for weapons." *Id.* at 524. In *Noble*, the officer had no specific facts linking Noble to drug trafficking and indeed did not know who Noble was before the pat down. *Id.* Thus, given the weaknesses of the government's three justifications for the pat down, the court found in *Noble* that the officer did not have reasonable suspicion. *Id.* at 525.

### 2. *United States v. Pacheco*

In *Pacheco*, the Sixth Circuit analyzed the facts before it with *Noble* in mind. 841 F.3d at 391–94. The court determined that many factors which were missing in *Noble* were present in *Pacheco*. *Id.* at 392. They also determined that because the *Noble* court had acknowledged that the facts before it presented a close case, the presence in *Pacheco* of these missing factors nudged the case "across the boundary into constitutionally permissible conduct." *Id.*

13

Detectives in *Pacheco* received information from a confidential source that "two Hispanic men in a silver Lincoln Aviator were moving narcotics" from a particular apartment complex. *Id.* at 387. One detective set up surveillance at the apartment complex and, within forty-five minutes, saw a silver SUV exit the complex. *Id.* The detective followed the SUV and verified that it was a silver Lincoln Aviator with two Hispanic men inside. *Id.* at 387–88. After seeing the vehicle fail to properly signal a turn, the detective contacted patrol officers and told them about the traffic violation and the narcotics tip. *Id.* at 388. The officers began to follow the vehicle and pulled it over when they saw it swerve across double-yellow lines. *Id.* One officer approached the passenger side of the vehicle where Pacheco was seated. *Id.*

The officer asked Pacheco for his identification, but Pacheco did not respond. *Id.* Instead of retrieving identification, Pacheco began rummaging through the glove compartment but removed nothing from it. *Id.* Pacheco appeared to be extremely nervous. *Id.* He was fidgeting, avoiding eye contact, and failed to acknowledge any of the officer's questions. *Id.* Pacheco was glancing around the vehicle, rummaging through the glove compartment, and looking down at the floorboard near the center console. *Id.* The officer knew that the glove compartment, floorboard, and center console are often used to conceal weapons. *Id.* Accordingly, the officer requested that Pacheco exit the vehicle. *Id.* When Pacheco did not comply, the officer asked again, this time opening the door for him. *Id.* The officer then conducted a pat down of Pacheco and discovered contraband. *Id.*

The Sixth Circuit found that the pat down was justified by reasonable suspicion that Pacheco was armed based on three factors: (1) the tip was more detailed and further corroborated than that in *Noble*, (2) Pacheco was extremely nervous and failed to respond to or acknowledge the officer's commands, and (3) the stop occurred at night in a neighborhood known for drug

trafficking and gun violence. *Id.* at 392–94. First, the court found that the tip was more detailed and further corroborated than the tip in *Noble*. *Id.* at 392. "This made it more likely that the two men inside the Aviator were engaged in narcotics trafficking, and thus—given the strong association between drug dealing and firearms—more likely that they were potentially armed." *Id.* Thus, because the tip was accurate as to the vehicle's color, make, and model, and as to the descriptions of the occupants of the vehicle, the informant's tip supported the officer's decision to conduct a pat down. *Id.* at 392–93.

Second, the court found that, while it has "cautioned against relying too heavily on nervousness as indicia of dangerousness," it is a relevant factor in the totality of circumstances analysis. *Id.* at 393. Unlike the defendant in *Noble*, Pacheco seemed to become increasingly nervous as the stop progressed, avoided eye contact with the officer, fidgeted, and acted as though he was concealing something. *Id.* Further, while the defendant in *Noble* complied with all of the officer's commands, Pacheco failed to acknowledge the officer's presence and failed to obey the officer's commands. *Id.* The presence of these factors weighed in favor of finding that the officer in *Pacheco* had reasonable suspicion. *Id.*

Third, the court found that, while "mere presence in a high crime area is insufficient 'to support a reasonable, particularized suspicion that the person is committing a crime,'" it is "'among the relevant contextual considerations in a *Terry* analysis.'" *Id.* at 394 (citing *Hoover v. Walsh*, 682 F.3d 481, 495 (6th Cir. 2012)). Similarly, the court noted that "time of day 'is relevant without being independently dispositive.'" *Id.* Thus, that the area was known for its drug trafficking and gun violence and that the stop occurred at night were both relevant to the totality of circumstances analysis. *Id.* Based on these three factors, the Sixth Circuit found that the officer had reasonable suspicion to justify his pat down of Pacheco. *Id.*

### 3. *Noble* and *Pacheco* Compared to this Case

Pendelton urges this Court to find the circumstances in this case more like those in *Noble*. Obj. R. & R. 6, ECF No. 168. He highlights the Sixth Circuit's holdings that "a passenger's presence in a vehicle suspected of trafficking is not an automatic green light for performing a pat down of that person," *id.* at 5 (citing *Noble*, 762 F.3d at 523), "that nervousness is an unreliable factor for a search," *id.* (citing *Noble*, 762 F.3d at 522), "and that the Sixth Circuit has always required some corroboration that particular individuals are involved in drug trafficking before allowing a pat down for weapons," *id.* at 5–6 (citing *Noble*, 762 F.3d at 524). He urges that each of these factors that the magistrate judge considered in his analysis actually weigh against a finding of reasonable suspicion. *Id.* at 6.

It is important to note that when considering factors that may justify a pat down, courts use a totality of the circumstances analysis. *See Pacheco*, 841 F.3d at 394.

> In applying the totality-of-the-circumstances test, the Supreme Court has cautioned against separating each factor from the others and finding an innocent explanation for it. This is so because "sometimes behavior giving rise to reasonable suspicion is entirely innocent," and often there may be a "series of acts, each of them perhaps innocent in itself, but which taken together warrant further investigation."

*Id.* (citing *Illinois v. Wardlow*, 528 U.S. 119, 130 n.4 (2000)). Thus, this Court will not separate each factor from the others to attempt to find an innocent explanation for it. *See id.* Rather, the Court will lay out all of the factors and determine whether, under a totality of the circumstances, Officer Thompson had reasonable suspicion.

First, like in *Noble* and *Pacheco*, Officer Thompson cited Pendelton's nervousness as one justification for the pat down. While nervousness alone cannot be a justification for a pat down, it is relevant under a totality of the circumstances. *See Pacheco*, 841 F.3d at 393. In this case, Officer Thompson noticed that Pendelton was acting very nervous—sweating and breathing

16

heavily—which was inconsistent with Officer Thompson's prior interactions with Pendelton. R. & R. 4, ECF No. 165. The fact that the nervousness was inconsistent with Officer Thompson's prior interactions with Pendelton is relevant because it tends to show that Pendelton is not generally nervous around police officers. Rather, Pendelton had been "cool, calm, and collected" and "very respectful to police officers" in prior interactions. *Id.*

This case can be distinguished from both *Noble* and *Pacheco*. It can be distinguished from *Noble* because Officer Thompson immediately patted down Pendelton after noticing Pendelton's nervousness. *See id.* This case can also be distinguished from *Pacheco*, however, because Pendelton complied with Officer Thompson's commands and because Pendelton's nervousness did not appear to increase before the officer conducted the pat down. Thus, this case appears to strike somewhere in the middle of these two cases in regards to nervousness. Because the Sixth Circuit identified *Noble* as a "close case," the Court will consider Pendelton's nervousness as one factor in weighing whether Officer Thompson had reasonable suspicion.

Pendelton attempts to explain his sweating by pointing out that "Pendelton had been riding a bike in Mid May in Louisville, Kentucky." Obj. R. & R. 6, ECF No. 168. This may be the case, but it does not explain that Officer Thompson described Pendelton as not only sweating, but also breathing heavily and "very nervous." R. & R. 4, ECF No. 165. Additionally, Officer Thompson had followed the F-150 for several blocks before initiating the traffic stop. *Id.* at 3. That Pendelton would still be breathing heavily from his previous bicycle riding is unlikely.

Second, like in *Pacheco*, the activities leading up to the traffic stop occurred in a high crime area. Like nervousness, while presence in a high crime area alone is insufficient, it is a relevant consideration. *See Pacheco*, 841 F.3d at 394. In this case, the activities leading up to the traffic stop occurred in Park Hill, a "very active" area for crime, including narcotics trafficking.

17

R. & R. 1, ECF No. 165. Thus, the Court will consider presence in a high crime area as one factor in weighing whether Officer Thompson had reasonable suspicion.

Third, like in *Noble* and *Pacheco*, the officers here had received a tip of a narcotics complaint. *Id.* at 2. Unlike in *Noble*, however, there is significant corroboration here. So long as there is corroboration, an officer can rely on his knowledge and experience "that drug dealers frequently carry weapons." *Noble*, 762 F.3d at 524. This level of corroboration allows Officer Thompson to conduct a pat down based on his knowledge that narcotics traffickers are frequently armed. *See* R. & R. 4, ECF No. 165.

The officers had corroborating evidence that provided reason to believe that Pendelton, specifically, was engaged in drug trafficking. While surveilling Park Hill, Officer Odle observed an individual dressed in orange riding a bicycle to various target locations of the investigation. *Id.* at 2–3. The individual would enter an apartment, remain inside for a few minutes, exit the apartment, and ride his bicycle to another target location. *Id.* Based on his previous experience, Officer Odle recognized the individual's actions as consistent with narcotics trafficking. *Id.* at 3. Officer Odle also observed the individual enter the passenger side of the F-150. *Id.* Officer Odle was communicating his observations to Officer Thompson through a closed police radio channel. *Id.* at 2. When Officer Thompson stopped the F-150, he noticed that Pendelton had an orange pullover on the seat beside him. *Id.* at 4. At this point, Officer Thompson concluded that Pendelton was the individual that Officer Odle had observed walking and biking back and forth between the target locations. *Id.*

Pendelton argues that, while "Officer Odle had observed Pendelton . . . riding a bike and going in and out of various apartments," that Officer Odle had also "observed dozens of other people" doing the same things "without imputing drug activity to them." Obj. R. & R. 6, ECF

No. 168. But given that Pendelton was riding his bicycle between target locations in the Park Hill investigation, the Court finds that it was reasonable for the officers to suspect Pendelton of drug trafficking. The Court finds that there is sufficient corroborating evidence here, combined with the tip, to make it more likely that Pendelton was armed "given the strong association between drug dealing and firearms." *See Pacheco*, 841 F.3d at 394. The Court will consider this evidence when weighing whether Officer Thompson had reasonable suspicion.

Finally, Pendelton argues that his mere presence in the F-150 at the time of the stop is insufficient to give rise to a reasonable suspicion. Obj. R. & R. 5–6, ECF No. 168. It is true that "a person's mere presence in a car, which the police believe is connected to drug trafficking, is not an automatic green light for frisking that person." *Noble*, 762 F.3d at 523. But Pendelton was not patted down because of his mere presence in the F-150. Rather, Pendelton's presence in the F-150 caused Officer Thompson to initiate a traffic stop. It was not until Officer Odle observed the individual dressed in orange enter the F-150 that the F-150 became an item of interest. R. & R. 3, ECF No. 165. In other words, Pendelton's alleged activities in Park Hill—not the familiarity of the F-150—caused Pendelton's pat down. As such, Pendelton's argument here is unavailing.

Given the totality of the circumstances, the Court finds that Officer Thompson had reasonable suspicion to believe that Pendelton was armed and that the pat down was justified. First, Pendelton appeared to be very nervous, which Officer Thompson noted was inconsistent with his prior interactions with Pendelton. Second, the activities leading up to the traffic stop occurred in Park Hill, a "very active" area for crime, including narcotics trafficking. Third, the officers had received a tip of narcotics trafficking, and the tip was corroborated by Officer Odle's observations of Pendelton in Park Hill. Given the strong association between drug dealing and

firearms, the Court finds that Officer Thompson was justified in patting down Pendelton. Accordingly, Pendelton's objection to the magistrate judge's conclusion that Officer Thompson's pat down of Pendelton was valid will be overruled.

V. Conclusion

The Court will adopt the report and recommendation in full. The Court will overrule Pendelton's objections to the magistrate judge's report and recommendation. The Court will grant in part and deny in part Pendelton's motion to suppress. The Court will grant Pendelton's motion to suppress as to Pendelton's statements to Officer Thompson. The Court will deny Pendelton's motion to suppress as to all other evidence.

The Court will enter an order in accordance with this memorandum opinion.

June 23, 2017

**Charles R. Simpson III, Senior Judge**
**United States District Court**